# FOR PUBLICATION

**FILED & ENTERED**

**OCT 15 2021**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY jle          DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>Michael William Devine<br><br>Debtor(s). | CHAPTER 7<br><br>Case No.:  8:18-bk-10905-MW<br>Adv No:   8:19-ap-01095-MW |
| The United States Trustee For Region 16<br><br>Plaintiff(s),<br>v.<br><br>Michael William Devine<br><br>Defendant(s). | **MEMORANDUM DECISION AND ORDER**<br><br>Date:         September 20, 2021<br>Time:         9:00 AM<br>Courtroom:  6C |

Frank M. Cadigan, Esq. for the Plaintiff United States Trustee for Region 16

Christopher J. Langley, Esq. For Debtor-Defendant Michael William Devine

**WALLACE, J.**

      This adversary proceeding came on for trial on September 20, 2021 to determine whether defendant-debtor Michael William Devine ("Mr. Devine") should be denied a discharge.  Plaintiff United States Trustee for Region 16 (the "UST") alleges

-1-

that Mr. Devine should be denied a discharge pursuant to 11 U.S.C. §§ 727 (a)(2)(A), 727 (a)(3) and 727 (a)(5).

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157, 1334 and the General Order, filed July 1, 2013, of the United States District Court for the Central District of California. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

Pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7008, the UST and Mr. Devine consent to the entry of a final order by this Court in this adversary proceeding. Venue is proper pursuant to 28 U.S.C. § 1409.

**FINDINGS OF FACT**

Many, perhaps even most, of the material facts in this matter are undisputed by the parties. However, the parties sharply disagree about the legal consequences of those facts in terms of Mr. Devine's entitlement or non-entitlement to a discharge. The facts found by this Court as set forth below consist of (1) facts stipulated by the parties in the Joint Pre-Trial Stipulation, Docket No. 29, filed September 16, 2020 (approved by this Court pursuant to the Order Setting Adversary Proceeding for Trial, Docket No. 52, filed and entered August 9, 2021) and (2) facts shown in the direct-testimony declarations of witnesses. The Court notes for the record that the parties stipulated in open court to waive their rights to cross-examination of the witnesses who supplied direct-testimony declarations. The Court also notes for the record that the trial in this matter was delayed because of difficulties and restrictions attributable to the Covid-19 Pandemic.

**1. Mr. Devine's Background, Education and Occupation**

Mr. Devine graduated high school in 1991. He then began work as a laborer in the construction industry. Around 1999 he moved into a sales and management position with California Bath Restoration in Newport Beach. He spent one

semester in college (Interior Designers Institute in Newport Beach) studying interior design before dropping out due to the pressures of working a full-time job and raising his son. He did, however, complete a certificate program at Interior Designers Institute while enrolled there.

In or about 2005, Mr. Devine formed Devine Design, a sole proprietorship, to engage in the home remodeling business. He learned the business through trial and error. Since 2005, Devine Design had completed a total of 9,636 projects. In 2017 (a key year, as will be seen below), Devine Design had 124 projects pending. Twenty of those projects failed when Devine Design's business was shut down.

Mr. Devine maintained a bank account at California Bank & Trust Co. during 2017. Toward the close of the year, he opened a bank account at Wells Fargo. This Wells Fargo bank account was opened on or about December 12, 2017 and was closed on or about January 31, 2018. Mr. Devine used these accounts for both business and personal transactions. Moneys in those accounts were commingled in the sense that there was no segregation of account funds based upon whether the money's origin was business or personal. Money in the accounts was used to pay both business and personal expenses. A third-party accounting/bookkeeping service prepared financial statements for Devine Design using bank statements.

### 2. Devine Design's Financial Difficulties

Devine Design encountered financial difficulty in 2017. Mr. Devine states in his declaration that Devine Design became busier in 2017, leading him to subcontract out more work, which in turn created financial problems because of lower profits and "a bad financial cycle." To deal with the financial stresses, he obtained merchant cash advances from several "hard money" lenders who charged interest rates approximating 45 percent per annum. Among these were Yellowstone ($258,000), Cap Call ($68,000), and Millstone ($10,338.66). He alleges in his declaration that although the Joint Pre-Trial Stipulation states these merchant loan advances were taken out in the second

quarter of 2017, in truth and fact they were taken out during the third quarter of 2017. He alleges he paid $291,499 in interest during 2017 on account of the merchant cash advances. (This number does not equate with 45 percent interest on the sums stated above over approximately one-half of the 2017 calendar year).

Devine Design defaulted on these hard money loans around approximately November 2017. The lenders obtained confessions of judgment and began levying Devine Design's bank account, draining moneys needed to keep the business running. Mr. Devine closed the Wells Fargo bank account for the purpose of avoiding future levies and opened up a new bank account at Orange County Credit Union ("OCCU") in February 2018. His declaration states, "In or about February 2018, I opened a new bank account at [OCCU] so Devine Design could continue operating the business without further levies by Cap Call and Yellowstone." Trial Declaration of Michael Devine, Docket No. 39, filed October 31, 2020 ("Devine Declaration") at page 6 of 9, lines 21-23.

During the final quarter of 2017, Mr. Devine and Devine Design were beset by a host of additional problems and concerns. He was hospitalized overnight with high blood pressure in October and November 2017. At some point in 2017 (perhaps in the fourth quarter, perhaps not) he suffered from mental depression and three separate bouts of pneumonia. He attributes these health issues to working 15-hour days, 7 days per week and sleeping only 4 hours per night over the preceding 7 years.

Devine Design moved its warehouse in the two and one-half to three-month period beginning October 2017 from San Clemente to Lake Forest to accommodate projects located north of Lake Forest. Mr. Devine did not supervise the move. He subsequently discovered that $50,000 to $60,000 in tools were missing and quite possibly stolen. Other management errors (attributed by Mr. Devine to his employees, not to himself) consisted of ordering materials based upon the wrong dimensions or shipping them to the wrong addresses.

The Devine Declaration states that "As a result [of the problems stated above], I began to lose track of Devine Design's expenses on a project-by-project basis. My project accounting faltered and I could no longer identify which expenses were incurred for which project. Nor could I explain whether orders to custom materials were placed, or whether custom ordered materials were received (and lost in the warehouse move) or not received at all." Devine Declaration at page 6 of 9, lines 3-7. The Court does not regard this portion of the Devine Declaration as entirely credible. It suggests that at one point Devine Design was accounting for expenses and purchased materials on a "project-by-project" basis whereas in point of fact the Court's attention has not been addressed to any corroborating evidence indicating that Devine Design's accounting was ever conducted on a project-by-project basis. Indeed, Devine Design's inability to answer the question "where did the money go?" with respect to deposits made by customers Lisa Getson and Todd Lansinger as early as January 21, 2017 – months earlier than when the wheels began to come off the cart in the third quarter of 2017—is strong evidence that Devine Design's failure to account on a project-by-project basis was a longstanding failure and cannot be explained away or justified solely by reference to bad events occurring in the second half of 2017.

### 3. Commencement of the Bankruptcy Case

Devine Design's existence outside of bankruptcy did not long survive the opening of the OCCU bank account in February 2018. Mr. Devine filed a voluntary petition under chapter 7 on March 19, 2018. Richard Marshack was appointed as chapter 7 trustee. Amended schedule E/F (filed May 23, 2018) lists 107 creditors holding $1,534,388.26 in general unsecured claims. Of the 107 general unsecured creditors, 35 are individuals who were customers of Devine Design (the "Former Customers"). The Former Customers hold claims aggregating about $744,000, roughly one-half of all general unsecured claims. Mr. Devine states "I was and remain unaware of the exact amount owed to the Former Customers but estimated amounts based on

what they might claim." Devine Declaration, page 2 of 9, lines 19-20.

Mr. Devine insists that "what I did not do was take money from the company, for anything other than my basic living expenses. My employees were always paid first and my personal finances were always secondary." Devine Declaration at page 8 of 9, lines 6-7. In this connection, the Court notes that the UST does not allege that Mr. Devine improperly took money from Devine Design or used it to fund personal expenses associated with extravagant living.

### 4.     Development of Evidence By the UST

The UST gathered evidence through the section 341(a) examination and a Rule 2004 examination of Mr. Devine. Based upon such evidence, the UST filed a complaint on May 24, 2019 objecting to Mr. Devine's discharge and urging the Court to deny him a discharge.

Michelle Steele, a Paralegal Specialist with the United States Department of Justice, reviewed bank statements, deposit slips, and cancelled checks provided by Mr. Devine to the UST, including those pertaining to the California Bank & Trust Company for the period January 1, 2017 through December 31, 2017, Wells Fargo Bank for the period December 12, 2017 through January 31, 2018 and OCCU for the period February 1, 2018 through August 31, 2018. A stipulation for a Rule 2004 examination and the production of documents between the UST and Mr. Devine required Mr. Devine to produce all documents related to claims listed by Mr. Devine on his Amended Schedule F, including written agreements, contracts, invoices, and purchase orders for materials, to assist the UST in determining the disposition of moneys that Mr. Devine had received from his customers. Mr. Devine did not produce such documents. In an effort to determine "where did all the money go?," Ms. Steele relied upon the documents which Mr. Devine did produce (described above) and, in addition, documentation supplied by Mr. Devine's customers showing their payments to Mr. Devine and Devine Design.

Ms. Steele attempted to reconcile the evidence of payments by former customers to Mr. Devine and Devine Design with the bank statements and related documents produced by Mr. Devine. These efforts ultimately failed. The UST alleges that this was not for want of trying, that Ms. Steele devoted a great deal of time to the project.

More specifically, Lisa Getson and Todd Lansinger paid $299,462.66 to Devine Design between January 21, 2017 and November 21, 2017 in 18 separate payments. Only one of the 18 payments, $10,000 by check on March 16, 2017, could be traced on Devine Design's bank statements. Perhaps not coincidentally, this was the only one of the 18 payments made by check. The other 17 were made by Visa Card or American Express, and none of them could be identified on the bank statements. Thus, unaccounted-for payments exceed $289,000, certainly not an immaterial amount.

The agreed-upon price of the Getson/Lansinger project undertaken by Devine Design was about $317,000. Large portions of the work were never done, and Mr. Devine failed to produce copies of purchase orders with third-party vendors for materials to be used on the job. Ms. Getson and Mr. Lansinger provided a direct-testimony trial declaration (unchallenged by Mr. Devine) stating that they lost a net $75,000, and the only reason that number is relatively low is because Visa and American Express gave them $50,000 in credits. Ms. Getson and Mr. Lansinger have provided exhibits to their declarations containing abundant documentary evidence supporting all their claims and contentions.

Robert and Kristen Rogers, former customers of Devine Design, paid a total of $106,000 in four separate payments to Devine Design between June 1, 2017 and October 27, 2017. Only two of the four payments (whose sum is $55,000) could be traced by Ms. Steele back to the Devine Design bank accounts. Large portions of the contracted-for work were never performed, and after being asked to do so, Mr. Devine failed to account for kitchen cabinets that were paid for but never delivered. The Rogers estimate that they never received value for approximately $60,000 of the

$106,000 they paid to Devine Design.

Anders and Rochelle Lind, former customers of Devine Design, paid a total of $71,450.00 to Devine Design in five separate payments between October 17, 2017 and June 14, 2018.  None of the five payments could be traced by Ms. Steele back to the Devine Design bank accounts.  The kitchen cabinets they bought and paid for were never delivered.  The Linds had contracted with Devine Design for extensive home remodeling.  Devine Design performed demolition work as part of the project.  Subsequently, the Linds learned from their architect (not connected with Devine Design) that load-bearing walls had been improperly removed, thereby jeopardizing the Linds' physical safety.  As a result, they found it necessary for the protection of their own lives to leave their home and take up residence with their neighbors.  They eventually moved into a trailer parked in their driveway.

Between August 21, 2017 and September 2, 2017, Todd and Susan Friedman paid Devine Design $24,500 in four separate payments (two by check, two by credit card) for Fieldstone cabinets and Cambria cabinets for the remodeling of their kitchen.  They never received the Cambria cabinets or, it would appear, the Fieldstone cabinets.  The two credit card payments cannot be traced to Devine Design' bank statements.  The amounts of the payments were $6,000 and $3,500, which do not correlate with deposits shown on the bank statements of $5,070 and $3,349.85.

### 5. Attempted Rebuttal of UST's Evidence By Mr. Devine

In his trial brief, Mr. Devine attempted to rebut the UST's contention that the items of gross income of Devine Design attributable to Former Customers' payments could not be tied to Devine Design's bank statements.  Defendant's Trial Brief, Docket No. 59, filed September 13, 2021 at pages 14-17 of 19.  A chart on page 15 of the brief attempts without much success to tie the known payments by Ms. Getson and Mr. Lansinger to income/deposit entries on Devine Design's bank statements.  For example, Mr. Devine attempts to tie payments by Ms. Getson and Mr. Lansinger of

$20,000 on September 8, 2017 and of $15,000 on September 11, 2017 to deposits shown on the Devine Design bank statement of $16,749.85 on September 11, 2017 and $21,012.35 on September 13, 2017.  The obvious problem here is that known customer payments of $35,000 cannot be reconciled with known deposits shown on the Devine Design's bank statement of $37,762.20.  The difference cannot be chalked up to charges made by Square, the credit card payment processing service used by Devine Design, because such charges would <u>reduce</u> the amount credited by the bank as a deposit, not increase it.  When asked about this at the trial, Mr. Devine's counsel responded that Square had likely aggregated other customer credit card payments into these two deposits.  However, he could not say who among the customers had made these other credit card payments.  Nor is there any way of determining from Devine Design's bank statements who had made the other credit card payments that pushed the total credited amount from $35,000 to $37,762.20.

        This raises an obvious problem.  If there are items of accounting information that are absolutely essential to running a business where multiple customers are making multiple installment payments over a number of months, they would be (1) how much your customers have already paid you and (2) how much they still owe you.  Yet this information can nowhere be gleaned from the documentary evidence produced by Mr. Devine.  In response to the Court's inquiry at trial about this issue, Mr. Devine's counsel responded that he used QuickBooks, and the information was recorded there.  However, such alleged QuickBooks information was not produced by Mr. Devine.  He produced very voluminous financial reports by Pagett Business Service (located in Carlsbad, California) that contain hundreds of pages of information on <u>expenses</u> of Devine Design, but essentially nothing at all on income of Devine Design (other than a single line item for total sales for the period and a single line item for refunds).

//
//

**CONCLUSIONS OF LAW**

The issue before the Court is whether Mr. Devine should be denied a discharge based upon 11 U.S.C. §§ 727(a)(2)(A), 727(a)(3) and/or 727(a)(5). The UST must prove his case by a preponderance of the evidence. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). In keeping with bankruptcy's "fresh start" objective for honest debtors, bankruptcy courts must construe Bankruptcy Code section 727 liberally in favor of debtors and strictly against parties objecting to discharge. *Bernard v. Sheaffer (In re Bernard),* 96 F.3d 1279, 1281 (9th Cir. 1996).

**A.   11 U.S.C. § 727(a)(2)(A):  "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred . . . property of the debtor, within one year before the date of the filing of the petition . . ."**

Based in part upon Mr. Devine's admission that he opened the OCCU bank account approximately one month before filing his bankruptcy petition "so Devine Design could continue operating the business without further levies by Cap Call and Yellowstone," the UST argues that Mr. Devine transferred property with the intent to hinder and delay Cap Call and Yellowstone within one year before the filing of the petition and therefore should be denied a discharge pursuant to Bankruptcy Code section 727(a)(2)(A). In rebuttal, Mr. Devine argues that opening the OCCU bank account and depositing $2,809.80 by check was not a "transfer" within the meaning of section 727(a)(2)(A) because he still had an interest in the funds transferred.

The UST relies upon *Locke v. Schafer (In re Schafer),* 294 B.R. 126 (N.D. Cal. 2003). That case has facts remarkably similar to the facts in this case. Schafer's Vintage Bank account was attached by Transamerica Commercial Finance Corp. Schafer then opened a new account at Mechanics Bank and deposited $75,000 therein. In deposition testimony, he stated that he opened the Mechanics Bank account because Transamerica Commercial Finance Corp. had attached his Vintage Bank account, and that he used money in the new Mechanics Bank account to pay his creditors on a pro rata basis. The bankruptcy court held that the transfer of money to Mechanics Bank

was a "transfer" within the meaning of 11 U.S.C. §§ 101(54), 727(a)(2)(A) made within one year before the filing of the bankruptcy petition and therefore denied Schafer's discharge.  The district court, in the decision cited above, affirmed the bankruptcy court.  A bank deposit, the district court wrote, clearly falls within the definition of "transfer" because it was a mode of disposing of or parting with property.  Additionally, withholding funds from one creditor to pay another creditor does not absolve the debtor from a violation of section 727(a)(2)(A).

The United States Court of Appeal for the Ninth Circuit has stated that depositing money into a bank account is a "transfer" within the meaning of the Bankruptcy Code.  *Bernard v. Sheaffer (In re Bernard),* 96 F.3d 1279, 1282 (9th Cir. 1996) ("If, as the legislative history indicates, depositing money into a bank account is a transfer, then later withdrawing money from that account should be a transfer, too – it ought to be a two-way street").  The Ninth Circuit decided not to rely upon the legislative history but instead upon reasoning from the nature of a bank account under California law.  California law provides that the relationship between a depositor and a bank is one of creditor and debtor.  Title to deposited funds passes immediately to the bank upon deposit, and the depositor becomes a creditor of the bank.  Thus, a "transfer" has occurred because the depositor has parted with or disposed of the money that was deposited.  Employing this reasoning, the Ninth Circuit held in *Bernard* that a withdrawal from a bank by a depositor is a "transfer."  This reasoning applies with equal force to a deposit of money or a check into a bank account.

Mr. Devine relies upon *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank (In re Consolidated Pioneer Mortgage Entities),* 166 F.3d 342 (9th Cir. 1999) (formally designated by the Ninth Circuit as Unpublished Disposition), *aff'g* 211 B.R. 704 (S.D. Cal. 1997).  In that case, Consolidated Pioneer Mortgage Entities ("Pioneer Debtor") deposited checks with San Diego Trust & Savings Bank ("SDT").  SDT gave Pioneer Debtor provisional credit while the checks were being cleared with the depository institution on which the check was drawn (an "Issuing Bank").  Pioneer

Liquidating Corporation ("PLC") argued that what was occurring in substance was that SDT was making a loan (i.e., the granting of provisional credit) to Pioneer Debtor, Pioneer Debtor was repaying the loan when the Issuing Bank paid SDT, and the repayment was a "transfer" that could be set aside and recovered under 11 U.S.C. § 550 as a preference or, alternatively, a fraudulent transfer.  The district court declined to find a "transfer" in this situation, and the Ninth Circuit affirmed.

Mr. Devine argues that *Pioneer Liquidating Corporation* stands for the proposition that a deposit of a check with a bank is not a "transfer."

The Court disagrees with this analysis. The Ninth Circuit in its unpublished opinion determined that SDT did not in form or substance make a provisional loan to Pioneer Debtor when it accepted a check for deposit; it was merely offering a service to Pioneer Debtor.  With the provisional loan out of the picture, all that is left is a payment from the Issuing Bank to SDT in the check-clearing process.  Obviously, this is a payment or "transfer" by the Issuing Bank, not Pioneer Debtor.  As the district court pointed out, "[t]he customer never even knows when 'repayment' occurs." 211 B.R. at 712. The district court also pointed out that <u>after</u> a check was deposited by Pioneer Debtor with SDT, SDT acquired a security interest in the check and full equitable title to the check, with Debtor being left with only bare legal title.  For this reason, it could not be said that the Issuing Bank was somehow acting as Pioneer Debtor's agent when it paid the check as part of the check clearing process.  This analysis confirms that it was the Issuing Bank, not Pioneer Debtor, that made a transfer to SDT when a check was <u>cleared</u>. *Pioneer Liquidating Corporation* does not address whether Pioneer Debtor's <u>deposit</u> of a check was a "transfer" to SDT, that interpretation not being argued by Pioneer Debtor.

The UST has established each of the requisite elements of a denial of discharge pursuant to 11 U.S.C. § 727(a)(2)(A):  (1) Mr. Devine made a "transfer" when he deposited a check with OCCU; (2) such transfer occurred sometime during February 2018, which is within one year before Mr. Devine filed his voluntary chapter 7 petition on

March 19, 2018; and (3) the deposited check was Mr. Devine's property; and (4) Mr. Devine admitted that he opened the OCCU account so that Devine Design could continue operating without levies by Cap Call and Yellowstone (thereby establishing that the transfer to OCCU was made with the intent by Mr. Devine to hinder and delay Cap Call and Yellowstone). *Cf. Hansen v. Moore (In re Hansen),* 368 B.R. 868, 876 (B.A.P. 9th Cir. 2007) ("Intent to hinder, delay, or defraud may be inferred from circumstantial evidence"). Here, the Court determines that the requisite intent is established by Mr. Devine's admission that he opened the OCCU account so Devine Design could continue operating without Cap Call and Yellowstone levies.

Based upon this analysis, Mr. Devine is denied a discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

**B.    11 U.S.C. § 727(a)(3):  " . . . the debtor has concealed, destroyed, mutilated . . . or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case . . ."**

The purpose of 11 U.S.C. § 727(a)(3) is to make a debtor's discharge dependent on a true presentation of his financial affairs. *Caneva v. Sun Cmtys. Operating L.P. (In re Caneva),* 550 F.3d 755, 761 (9th Cir. 2008). This disclosure requirement removes the risk to creditors of the withholding or concealment of assets by the debtor under the cover of a chaotic or incomplete set of books and records. *Id.* The records must be such that the panel trustee and creditors receive sufficient information to trace a debtor's financial history for a reasonable period past to present. *Wachtel, Executor v. Rich (In re Rich)*, 353 B.R. 796, 812 (Bankr. S.D.N.Y. 2006). In particular, there should be sufficient information to "determine what has passed through a debtor's hands." *Exner v. Schultz (In re Schultz)*, 71 B.R. 711, 716 (Bankr. E.D. Pa. 1987).

The initial burden lies with the UST to show that Mr. Devine failed to keep and preserve any books and records from which his financial condition or business transactions might be ascertained. If the UST shows the absence of records, the

burden falls upon Mr. Devine to satisfy this Court that his failure to produce them is justified. *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 463 F.3d 229, 235 (2d Cir. 2006).

What occurred here may be briefly summarized as follows. Mr. Devine was required by the terms of a stipulation to produce his financial records in connection with a Rule 2004 examination. Among the records produced were Devine Design bank statements for 2017. The UST's financial analyst, Michelle Steele, attempted (with much effort) to tie the deposits shown on the bank statements with payments known to have been made to Devine Design based upon information supplied by Devine Design's former customers. She was unable to do so. The numbers simply did not match up and differed by amounts much greater than can be accounted for by factoring in processing charges by Square. This made it impossible for the UST to "determine what has passed through the debtor's hands." Through proof of these facts, the UST has met its initial burden of coming forward with evidence of an absence of sufficient records. The burden then shifts to Mr. Devine to satisfy the Court that his failure to produce them was justified.

Mr. Devine had an opportunity at trial to match up the known payments by customers with deposits into Devine Design's bank accounts. As discussed above, he failed once again.

What is striking about the evidence is that although the documents produced by Mr. Devine supply a tremendous amount of detailed information about Devine Design' <u>expenses</u>, there are few if any source documents substantiating and corroborating his <u>items of revenue</u>. The bank statements are source documents, but they do not tie to known information (supplied by customers based upon their payments to Mr. Devine) about his revenues. For example, the financial information prepared by Padgett Business Services for February 2017 consists of 11 single-spaced pages of itemized expenses (with over 600 separate entries of expenses) and only one line item of revenue: "02/28/17  Sales Bank Deposits-Clearing $206,231.58." The financial information presented by Padgett for other months of the 2017 calendar year is

substantially the same.

Mr. Devine argues that project-by-project accounting is not required.  Such accounting would require correlating the gross income from such a project with the expenses attributable to such project.  But that is not what is at issue.  Rather, what is at issue here is whether Mr. Devine kept recorded information, including books, documents, records and papers from which his financial condition or business transactions might be ascertained.  Determination of a person's financial condition and business transactions requires more than information about such person's <u>expenses</u>; information about such person's <u>revenues</u> is required.  To avoid a denial of discharge under section 727(a)(3), a debtor's recorded information must permit his revenues to be ascertained (note, ascertained, not merely guessed at).  Here, Mr. Devine's revenues cannot be ascertained because the bank deposits do not tie to known customer payments, and there is no valid explanation for the disparity that does not raise additional questions about the adequacy of Mr. Devine's records for purposes of section 727(a)(3).

Based upon his various illnesses, Mr. Devine contends his failure to keep records was justified.  However, he has failed to introduce evidence showing that, <u>at any time</u>, he was keeping adequate records.  This is not a case where adequate records were kept, illness ensured, and the records then fell into disarray.  It is a case where there is no showing that the records were ever adequate.

It takes little financial training or acumen to write down payments received from customers, the date received and the amount a customer still owes.  No mathematical skill beyond simple arithmetic is required.  Although Mr. Devine's education extends only slightly beyond high school, it is not justification for the absence of key records.

Mr. Devine's counsel argued at trial that the reason the known payments made by customers do not tie to the deposits shown on the bank statements is that the credit card processor was including (in a single deposit) payments made by other

customers. While this may have occurred, the bank statements do not permit the identification of the other customers making payments or, for that matter, the amount these other customers actually paid. Absent such information, Mr. Devine would not have been able to determine how much customers had paid him and how much they still owed. The Court does not see how any remodeling business with multiple customers making multiple installment payments over a number of months could long operate with such accounting procedures in place. This leads the Court to infer the existence of other written records correctly reflecting amounts that customers paid and amounts they still owed that were not produced by Mr. Devine and, in that sense, were "concealed" within the meaning of section 727(a)(3). As an independent ground for its finding that section 727(a)(3) applies here, the Court determines that Mr. Devine concealed records from which his financial condition and business transactions might be ascertained.

For these reasons, Mr. Devine is denied a discharge pursuant to 11 U.S.C. § 727(a)(3).

**C.    11 U.S.C. § 727(a)(5):  " . . . the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . ."**

A bankruptcy court can deny a discharge under section 727(a)(5) when a debtor has experienced a loss of assets that the debtor cannot satisfactorily explain. *Harrington v. Simmons (In re Simmons)*, 810 F.3d 852 (1st Cir. 2016). Section 727(a)(5) is designed to deter debtors from abusing the bankruptcy process by obfuscating the true nature of their affairs, and then refusing to provide a credible explanation. *Shamshovich v. Racer (In re Racer),* 5820 B.R. 45 (Bankr. E.D.N.Y. 2018). Here, the UST must show that Mr. Devine owned substantial and identifiable assets prior to filing bankruptcy, which could have been used to pay creditors, and once the UST provides sufficient proof that the assets existed, Mr. Devine must provide a satisfactory explanation of how those assets were lost. *Bailey v. Whitehead (In re*

*Whitehead),* 483 B.R. 902 (Bankr. E.D. Ark. 2012).  (In this regard, note the statute's use of the plural – "assets" – rather than the singular).

The UST asserts that the assets in question here are the known customer payments made by Ms. Getson, Mr. Lansinger, the Friedmans, the Rogers and the Linds.  The UST contends that Mr. Devine has failed to satisfactorily explain the loss of these assets.  The UST notes that Mr. Devine's explanation must be supported by at least some documentation, and the documentation must be sufficient to eliminate the need for the Court to speculate as to what happened, citing *First Commercial Financial Group, Inc. v. Hermanson (In re Hermanson),* 273 B.R. 538, 545-46 (Bankr. N.D. Ill. 2002) for this proposition.

In response, Mr. Devine contends that he <u>has</u> explained the loss of these assets by explaining how he became insolvent.

The Court finds for Mr. Devine on section 727(a)(5).  The Padgett Business Services Financial Information, Docket No. 39-2, filed October 31, 2020 at page 2 of 145 (admitted into evidence as a Defendant's Exhibit) shows revenues for calendar year 2017 (net of refunds) in the amount of $2,119,886, gross profit after cost of goods sold at $1,254,899, and operating expenses of $1,324,566, with a resulting net loss of $69,667.  As mentioned earlier, there is abundant detail on the operating expenses.  The UST has not shown that the known customer payments were not included in the $2,119,886 in reported revenues.  More important, the UST has made no showing that the total amount of deposits reported on the bank statements exceeds $2,119,886 or that the aggregate of the known customer payments exceeds the aggregate of the deposits shown on the bank statements.  Had the UST made either one of these showings, it would have demonstrated the existence of lost or missing assets.  Accordingly, the Court determines that the UST has not made out the kind of *prima facie* case that would shift to Mr. Devine the burden of satisfactorily explaining loss.

//

**CONCLUSION**

Judgment will be entered for UST. Mr. Devine is denied a discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(3).

The UST shall lodge a form of judgment within 14 days of the date of entry of this Memorandum Decision and Order.

IT IS SO ORDERED.

###

Date: October 15, 2021

Mark S. Wallace
United States Bankruptcy Judge